**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| PICKNEY ALSBROOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:19-cv-673-TFM-MU |
| | ) | |
| INTERNATIONAL PAPER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is *Defendant's Motion for Summary Judgment* (Doc. 26, filed January 15, 2021) and *Plaintiff's Motion to Dismiss Counts Three, Four, Six, and Seven of his Complaint* (Doc. 29, filed February 15, 2021). Having considered the motions and relevant law, the Court finds the Defendant's motion for summary judgment (Doc. 26) and Plaintiff's motion to dismiss (Doc. 29) are due to be **GRANTED**.

## I.   PARTIES AND JURISDICTION

For the purposes of this memorandum opinion and order, the Court will refer to Plaintiff Pickney Alsbrook as "Plaintiff" or "Alsbrook," and Defendant International Paper Company as "Defendant" or "International Paper."

The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(4).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.

## II.    BACKGROUND

### A.    Procedural Background

Plaintiff exhausted his administrative remedies when he timely filed his charges of disability and age discrimination on November 21, 2018, and retaliation on June 4, 2019, with the Equal Employment Opportunity Commission ("EEOC"), which issued Plaintiff a Notice of Right to Sue on June 24, 2019.  Doc. 1 at 1–2; Doc. 31-1 at 1, 12.

Plaintiff filed his Complaint with this Court on September 17, 2019, in which he brought claims of disability discrimination in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101–213 (Count One); ADA retaliation in violation of the anti-retaliation provisions of the ADA (Count Two); age discrimination in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621–34 (Count Three); ADEA retaliation in violation of the ADEA (Count Four); hostile work environment in violation of the ADA (Count Five); hostile work environment in violation of the ADEA (Count Six); and violation of the Uniformed Services Employment & Re-Employment Rights Act (the "USERRA"), 38 U.S.C. §§ 4301–35 (Count Seven).  Doc. 1.  Plaintiff brings his claims against International Paper as his employer.

On January 15, 2021, Defendant filed its Motion for Summary Judgment and supporting brief, to which Plaintiff timely filed his response and Defendant its reply.  Docs. 26, 27, 30, 31, 32.  Accompanying the filing of his response brief, Plaintiff also filed a motion to voluntarily dismiss counts three, four, six, and seven, to which Defendant filed its response.  Docs. 29, 33.

### B.    Factual Background

Alsbrook is a sixty-four year old male.  Doc. 31 at 1.  On June 19, 1995, International Paper hired Alsbrook to work at its Riverdale Mill in Selma, Alabama.  *Id.*  On August 8, 2005, the U.S.

Army issued Alsbrook orders to report for active duty on September 11, 2005. *Id.* at 2; Doc. 27 at 6. On August 30, 2005, Plaintiff submitted his Personal Leave of Absence Application, which International Paper approved. Doc. 27 at 6–7. Alsbrook's original orders stated that his period of active duty would be 545 days; however, Alsbrook's active duty was extended multiple times until August 2010. Doc. 31 at 2. As a result of his service, Alsbrook suffered from Post-Traumatic Stress Disorder ("PTSD"), and he was "given a 70% disability rating (50% for service-related PTSD and 20% for injuries incurred during service) by the United States Department of Defense." *Id.*

On September 1, 2010, following the completion of his military service, Alsbrook returned to his employment with International Paper. *Id.* Alsbrook was returned to the Sheet Room at the Riverdale Mill where he worked prior to his deployment; however, Alsbrook advised International Paper he believed he should be placed in the Woodyard. Doc. 27 at 7; Doc. 32 at 2. In February 2006, during Alsbrook's deployment, a position became open in the Woodyard that Buddy Hagemann ("Hagemann") bid for, and received, the position. Doc. 27 at 7. Alsbrook advised International Paper he had advised the human resources department, prior to his deployment, he wanted to work in the Woodyard and, due to his seniority, he believed he would have received the 2006 Woodyard opening had he not been on military leave. *Id.*; Doc 31 at 2. Pursuant to USERRA, International Paper replaced Hagemann with Alsbrook in the Woodyard position. Doc. 27 at 7; Doc. 31 at 3.

Alsbrook alleges, upon returning to work at International Paper, Hagemann began to intimidate, discriminate, and harass Alsbrook due to his military background and because he replaced Hagemann in the Woodyard when he returned from military service. Doc. 31 at 4. Examples of the hostile work environment that Alsbrook provided to International Paper include:

- **March 19, 2018** - Mr. Hagemann did not replace bad saws and passed the problem onto Mr. Alsbrook and his partner.  This resulted in Mr. Alsbrook losing most of his shift's run time due to having to run with toothless saws.

- **March 20, 2018** - Mr. Hageman again chose to pass a saw issue to Mr. Alsbrook instead of fixing the issue during his shift.

- **March 21, 2018** - Mr. Hageman again chose not to replace bad saw blades, but chose to pass the task to Mr. Alsbrook and his partner.  Mr. Alsbrook had no other choice but to lock out the slasher deck and replace toothless saws.

- **July 2, 2018** - Mr. Hagemann and Mr. Joe Weaver "choked" the chipper and had time to clear the chokes, but chose to pass the task onto Mr. Alsbrook and his partner.  Mr. Hagemann and his partner were never required to stay over and assist with situations they created and left for Mr. Alsbrook and his partner.

- **July 30, 2018** - Mr. Alsbrook observed that the wood chipper contained defective knives after Mr. Hagemann's shift.  Mr. Alsbrook notified his shift woodyard operator and tour foreman, as well as Kevin Bruner, his department head.  Mr. Alsbrook reminded Mr. Bruner of the countless times Mr. Hagemann and Mr. Weaver leave situations to be repaired.  Mr. Alsbrook further informed Mr. Bruner that Mr. Hagemann's actions were continued harassment.

- **August 8, 2018** - Mr. Alsbrook was informed that Mr. Hagemann filed a grievance against him regarding how he (Alsbrook) and his partner operate their shift.  Mr. Alsbrook stated that the grievance was nothing more than Mr. Hagemann continuing to harass, intimidate, and bully him.

- **September 2, 2018** - Mr. Hagemann and his partner again left defective knives in the chipper.  Mr. Alsbrook texted Mr. Bruner and advised him of Mr. Hagemann and Mr. Weaver's latest efforts to bully, harass, and intimidate him.  Mr. Bruner informed Mr. Alsbrook to contact Eddie Hyde, tour foreman, and show him the conditions of the knives.

Doc. 31 at 3–4 (citing Doc. 31-1 at ¶ 8) (internal citations omitted).

In September 2018, Alsbrook called in a complaint to the Riverdale Mill's Human Resources Department's Ethics Help Line ("Ethics Help Line").  Doc. 27 at 9; 31 at 4.  Alsbrook's complaint was to inform International Paper that Hagemann and Joe Weaver ("Weaver") were attempting to sabotage Alsbrook's work "because of his military background" and in retaliation for him replacing Hagemann upon his return from military service.  Doc. 27 at 9; Doc. 31 at 4–5.

As a result of this complaint, a meeting was scheduled for October 3, 2018, with Alsbrook; his Union Representative, Jessica Banks ("Banks"); and International Paper's H.R. Generalist, Kathy Turner ("Turner").   Doc. 27 at 9; Doc. 31 at 5.   Alsbrook, admittedly angry, reiterated that Hagemann and Weaver were attempting to sabotage him, stated he was "sick and tired of working in a hostile work environment," and cited to the examples discussed *supra*.  Doc. 31 at 5; Doc. 31-3 at 2.  The conversation continued as follows:

> [Alsbrook]: I cannot work in a hostile environment.  I am sick and tired of all the bullshit.  He is going to push my buttons one day and he will find out how protected he really is.
>
> [Turner]: What do you mean by that?
>
> [Alsbrook]: I am just sick of it.  If they want to see, how far I will take it they will find out.
>
> [Turner]: Buddy, what do you mean by that statement?
>
> [Alsbrook]: Take it however, you want to.
>
> [Turner]: I am taking it as a threat.
>
> [Alsbrook]: Divine intervention has kept him safe for this long.  I am not going to put up with the bullshit one more minute.  Mill management has proven they are not going to do a damn thing about it.  I know what I can sue this company for and what I can sue them for.
>
> [Turner]: Buddy, I am going to ask you again, what do you mean by you are going to take care of it?
>
> [Alsbrook]: I told you to take it however, you want to.  If no one in this company will do anything about it I am going to.
>
> [Banks]: Buddy, you need to calm down.  You cannot mean it as a threat.  Just calm down.  Kathy is trying to help.  You have not ever talked to her.  She is trying to help you.

Doc. 31-3 at 3.  Turner concluded the meeting and stated that they will continue to investigate Alsbrook's complaints.  *Id.* at 4.  As part of the investigation, the H.R. department interviewed Woodyard employees Hagemann, Weaver, Rodney Dunkin ("Dunkin"), and Woodyard Operators Phillip Daniels and Alfonso Hasberry.  Doc. 31-3 at 4–6.

On October 30, 2018, Alsbrook visited the Human Resources department to inquire about

the status of the investigation.  Doc. 31 at 6; Doc. 31-3 at 7.  Speaking with H.R. Specialist Kelly Bert ("Bert"), Alsbrook reported the situation was worsening, and he was upset and angry because nothing had been done.  Doc. 31-3 at 7.  Bert noted that Alsbrook stated that he "would have to deal with it on his own."  *Id.*  Bert forwarded the notes from this interaction to H.R. Leader Shelley Hobson ("Hobson"), H.R. Generalists Turner and Meagan Wright ("Wright"), and Mill Learning Leader Pam Frasier ("Frasier").  *Id.*

Later that afternoon, a meeting was called to discuss what Alsbrook meant by his "deal with it on his own" comment.  *Id.*  The meeting was attended by Alsbrook, Business Unit Manager Morgan Wedgeworth ("Wedgeworth"), Pulp Area Manager Kevin Bruner ("Bruner"), Pulp Front Line Leader Eddie Hyde ("Hyde"), and Frasier.  Doc. 31 at 5.  Alsbrook complained about the outgoing shift leaving a lot of work for his shift.  Doc. 31-3 at 7.  Bruner responded there was not an outage scheduled that day and, when he was contacted by the outgoing shift about replacing the knives, he directed them to keep running, thus, if the knives were in bad condition, it was due to his instructions.  *Id.*  Alsbrook explained he had put up with this environment for eight years and the company had not taken any action to make things better, and that is why he called in his EEO complaint.  *Id.*

Wedgeworth asked Alsbrook what he meant by his "deal with it on his own" comment, and if he was referencing the EEO complaint.  *Id.*  Alsbrook responded "[w]hatever it takes, nothing further" and stated he told his supervisor "are you going to put an end to it or am I going to put an end to it."  *Id.*  Bruner asked if it would help if they shut down the Woodyard fifteen minutes early and had a foreman conduct a walk-through between each shift.  *Id.* at 8.  After much heated debate, Alsbrook reiterated that "I can either keep putting up with it or I can not put up with it.  I am not putting up with it anymore."  *Id.* at 9.  Wedgeworth again asked what he meant by

these comments and Alsbrook responded "[a]ll of my options are on the table" and that they "got all the information you need." *Id.* Hyde agreed there was some truth to Alsbrook's complaints regarding some employees being lazy and sitting around the office during their shift. *Id.* Wedgeworth assured him they have been acting even if it may seem to Alsbrook as if they have not been, and he sent Alsbrook home for the day to cool off and get some sleep, with full pay. *Id.*

On October 31, 2018, Hobson contacted Alsbrook and advised him not to return to work until International Paper concluded its investigation into his comments. Doc. 31 at 6. Alsbrook was placed on paid administrative leave pending the results of the investigation. Doc. 27 at 15. On November 6, 2018, Hobson, Banks, and Alsbrook had a short meeting via telephone conference to, again, try to clarify the nature of Plaintiff's comments. Doc. 31-3 at 11–12. The conversation went as follows:

> [Hobson]: Buddy, I wanted to follow up on our conversation you had prior to being sent home pending investigation. I did not get a clear understanding from your statement in regards to what did you mean by stating, "I'll deal with it on my own".
>
> [Alsbrook]: I am not sure why I have been sent home and being investigated, when Hageman is the one who is bothering me.
>
> [Hobson]: Buddy, these are two separate issues, you were not sent home because you made an Ethics Complaint. Now, I need to ask that you answer all my specific questions in regards to this issue. I will repeat the question, what did you mean by stating, "I'll deal with it on my own".
>
> [Alsbrook]: I was referring to going to seek legal counsel for this issue. I have exhausted the entire chain of command and no one has fixed this issue in 8 years. If management will not address the issue, I have sought legal advice on this already. Hageman will not get away with this I have exhausted all the means I know who could have resolved this issue through the chain of command. Nobody including you have held him accountable.
>
> [Hobson]: Buddy, your statement was perceived as a violent threat. Was this your intent?
>
> [Alsbrook]: No.

[Hobson]: Did you advise management you had PTSD during the meeting with them? If so, are you being treated for PTSD at this time?

[Alsbrook]: Yes, but I cannot afford the treatment. [. . .]"

*Id.* Hobson further inquired if Plaintiff had reached out to International Paper's Employee Assistance Program, which offers free appointments to employees. *Id.* at 12. Plaintiff indicated he had not. *Id.*

On November 21, 2018, Alsbrook filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") due to being discriminated against on the basis of his age and disability. Doc. 31 at 6. On May 28, 2019, Alsbrook filed a supplemental charge of discrimination with the EEOC to include a new claim of retaliation. *Id.* at 7.

Alsbrook was on paid administrative leave from October 31, 2018, through March 4, 2019, at which time he was banned from the premises. Doc. 27 at 15; Doc. 31 at 7. Following negotiations between counsel for Alsbrook and International Paper, Alsbrook returned to work in the Woodyard on March 4, 2019, although on the day he returned to work he was mistakenly asked to leave or risk being arrested. Doc. 31 at 7. With the assistance from his attorney, Alsbrook was again cleared to return. *Id.* On June 30, 2019, Alsbrook informed International Paper he would be taking an indefinite leave of absence. Doc. 27 at 15; Doc. 31 at 8. Alsbrook is currently an employee of International Paper in voluntary leave of absence status. Doc. 27 at 15.

### III.   STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co.*, 423 F. App'x 955, 958 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).[1]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id*.

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go

---

[1] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).  "Speculation does not create a *genuine* issue of fact."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted).  In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## IV.    DISCUSSION AND ANALYSIS

Defendant asserts it is entitled to judgment as a matter of law as to all the counts that are

brought against them.  The Court will address Defendant's arguments for judgment as a matter of law as to each count.

A.      **Counts Three, Four, Six, and Seven**

On February 15, 2021, Plaintiff filed *Plaintiff's Motion to Dismiss Counts Three, Four, Six, and Seven of his Complaint* (Doc. 29), in which he moved to dismiss Counts Three (Age Discrimination), Four (Retaliation under the ADEA), Six (Hostile Work Environment under the ADEA), and Seven (USERRA) of his Complaint, "with prejudice, with each party bearing its own costs and expenses as to each dismissed claim."  Doc. 29.  On February 25, 2021, Defendant filed a response indicating it does not oppose dismissal of the requested claims; however, it does oppose the request that each party bear their own costs.  Doc. 33.

Since Defendant acquiesces to Plaintiff's request for dismissal of Counts Three, Four, Six, and Seven of his Complaint, the Court finds these claims are due to be dismissed and will pretermit discussion contained within Defendant's motion for summary judgment as to these four Counts. The Court will defer to a later date determination of Defendant's objection as to whether, when the issue becomes ripe, it is entitled to recover costs that are associated with litigating the four Counts that have been voluntarily dismissed.

B.      **Count One – Disability Discrimination**

Count One of Plaintiff's Complaint alleges Defendant "discriminated against him, due to his disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq."  Doc. 1 at ¶ 35.  Plaintiff claims he suffered harassment and intimidation as a result of his military service and due to replacing another employee when he returned from active-duty military service, which triggers his PTSD and depression.  Doc. 31 at 4–5.

Defendant argues summary judgment should be granted because Plaintiff is not disabled

as defined by the ADA, he cannot show that his adverse employment action was because of his disability, and he did not suffer an adverse employment action.  Doc. 27 at 21–22.  First, Defendant asserts Plaintiff cannot show he was disabled as defined by the ADA because he has not shown that the "alleged disability substantially limited a major life activity," he stated that he does not believe he is disabled, and he never requested any form of accommodation.  *Id.* at 22–23.  Defendant further argues Plaintiff cannot show that any alleged discrimination was on the basis of his disability, because he has maintained the alleged harassment by Hagemann was in response to Plaintiff replacing him upon returning from active-duty military service.  *Id.* at 24–26.  Additionally, Defendant avers that Plaintiff cannot show an adverse employment action or a constructive discharge because Plaintiff is still employed by Defendant, was temporarily placed on paid administrative leave, and is currently on a voluntary leave of absence that was initiated by Plaintiff.  *Id.*  at 24, 26–27.  Finally, Defendant argues they have articulated a legitimate, non-discriminatory reason for Plaintiff's paid administrative leave resulting from an investigation into perceived threatening comments that were made by Plaintiff during multiple meetings.  *Id.* at 28–30.

> The ADA's General Rule provides that:
>
> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) [he] is disabled; (2) [he] is a qualified individual; and (3) [he] was subjected to unlawful discrimination because of [his] disability.  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998)).  The Eleventh Circuit has held that "[t]he burden-shifting analysis of Title VII employment

discrimination claims is applicable to ADA claims." *Id.* Thus, "[o]nce the plaintiff establishes a prima facie case of discrimination under the ADA, if the employer articulates a legitimate, non-discriminatory reason for its alleged discriminatory action, the plaintiff must show that the reason was merely a pretext for discrimination." *Dulaney v. Miami-Dade County*, 481 F. App'x 486, 489–90 (11th Cir. 2012) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)). If the plaintiff is unable to create a genuine issue of material fact by submitting evidence sufficient to show the defendant's proffered reason is pretextual, then the defendant will be entitled to summary judgment. *Id.* at 490 (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

### 1.     Disability

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must first show he is disabled. The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; *or*
>
> (C) being regarded as having such an impairment

42 U.S.C.A. § 12102(1)(A)–(C) (emphasis added).

Here, Plaintiff asserts he was "given a 70% disability rating (50% for service-related PTSD and 20% for injuries incurred during service) by the United States Department of Defense," his PTSD causes him to suffer from depression, and he has stated he has been diagnosed with PTSD by a psychiatrist. Doc. 31 at 2; Doc. 31-3 at 4. Defendant argues Plaintiff cannot meet the first prong of his *prima facie* case that he is disabled because he fails to meet the requirements of 42 U.S.C.A. § 12102(1)(A). Doc. 27 at 22–23. Defendant argues Plaintiff has not established his PTSD substantially limits any of his major life activities because, during his deposition, Plaintiff testified his PTSD does not limit any of his daily activities and the VA rating system does not

address the severity requirement.[2]  Doc. 27-1 at 246, ¶¶ 12–18; Doc. 32 at 3.  First, for the purposes of this motion, the Court accepts PTSD qualifies as a mental impairment under the ADA.  29 C.F.R. § 1630.2(h) (defining "mental impairment" for EEOC proceedings as "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities.").  Next, the Court notes that the ADA defines "major life activities" as including, "but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C.A. § 12102.

Upon review of the entire record, there is no evidence in the record that any of Plaintiff's major life activities were substantially limited by his impairment.  While the record is sparse on references as to most major life activities that are set forth in the definition, the Court notes Plaintiff expressly testified his impairment does not limit any of his daily activities and he continually states his PTSD does not affect his performance at work and, in fact, he outperforms everyone else in his position.  *See, e.g.,* Doc. 27-1 at 246:5–22.  Plaintiff has also not submitted any medical opinion

---

[2] In its reply, Defendant cites to three cases of persuasive authority supporting the proposition that Plaintiff's VA disability rating involves a different inquiry than the one the Court must perform in deciding if a plaintiff is disabled pursuant to the ADA.  *See* Doc. 32 at 3–4 (citing *Smith v. Wilkie*, Civ. Act. No. 3:17-CV-1333-J-JRK, 2019 U.S. Dist. LEXIS 166688, at *40-44, 2019 WL 4737604, at *15 (M.D. Fla. Sept. 27, 2019); *Jones v. James*, No. 3:15cv522/RV/CJK, 2016 U.S. Dist. LEXIS 166051, at *13 n.4 (N.D. Fla. Nov. 1, 2016); and *Wingfield v. S. Univ. of Fla., Inc.*, Civ. Act. No. 8:09-CV-1090-T-TBM, 2010 U.S. Dist. LEXIS 59132, at *7, 2010 WL 2465189, at *7 (M.D. Fla. June 15, 2010)).  Upon review of the cases that were cited by Defendant and the law upon which those cases rely, it appears the language within the "Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act" that was relied upon by those courts and their cited references has been superseded.  *Compare* 29 C.F.R. § Pt. 1630, App., § 1630.2(k) (2011) *with* 29 C.F.R. § Pt. 1630, App., § 1630.2(h)–(k) (2016).  Thus, the Court declines to rely upon these cases in its analysis and application of 42 U.S.C.A. § 12102(1)(A).

evidence to support a finding that his major life activities are limited.  Plaintiff has failed to establish his mental impairment limits any major daily activities.

However, Defendant fails to recognize 42 U.S.C.A. § 12102(1) has two additional subsections, under which Plaintiff could still establish that he is disabled as defined by the ADA. Under 42 U.S.C.A. § 12102(1)(B), Plaintiff can establish he is disabled by showing a record of his impairment.  "An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment."  29 C.F.R. §§ 1630.2(k)(1)–(2) (West).

> This part of the definition is satisfied where evidence establishes that an individual has had a substantially limiting impairment.  The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.  There are many types of records that could potentially contain this information, including but not limited to, education, medical, or employment records.

29 C.F.R. § Pt. 1630, App., § 1630.2(k)(1) (2016).  While Plaintiff has submitted multiple affidavits that state he has PTSD and depression, he did not submit any medical, employment, or other records that establish either of his disabilities.  As such, there is insufficient documentation submitted to show that Plaintiff has a history of a mental impairment for the Court to find he has a record of mental impairments under 42 U.S.C.A. § 12102(1)(B).  Thus, Plaintiff has failed to establish a record of an impairment under the ADA, as defined by the EEOC.

Finally, under 42 U.S.C.A. § 12102(1)(C), Plaintiff can also establish he is disabled by showing he has been regarded as having his mental impairment by Defendant.  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is

perceived to limit a major life activity."  42 U.S.C.A. § 12102(3)(A).  The EEOC has stated prohibited actions "include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment."  29 C.F.R. § 1630.2(l)(1); *see also Dulaney*, 481 F. App'x at 489 (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1228 (11th Cir. 2005) ("Thus, an employer 'runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity.'")).  Plaintiff asserts, with knowledge of his PTSD and following a "heated" meeting that included vague comments made by Plaintiff, Defendant deemed him to be unstable, placed him on paid administrative leave, and banned him from the premises.  Although Defendant did not provide an argument on this issue, throughout its filings, Defendant disputes Plaintiff's account as to why Plaintiff was placed on leave.  The EEOC has stated "an individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action."  29 C.F.R. § 1630.2(l)(2).  Thus, construing the evidence in the light most favorable to the plaintiff, for the purpose of this motion, the Court assumes, without deciding, Defendant regarded Plaintiff as having a mental impairment and, therefore, meets the first prong of his *prima facie* case in that he qualifies as "disabled" as defined by the ADA.

### 2. Qualified Individual

To meet the second prong of a *prima facie* case of discrimination under the ADA, Plaintiff must show that he is considered a qualified individual under the statute.  "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). Defendant does not argue that Plaintiff cannot perform the essential functions of his position. In fact, Defendant's entire argument that Plaintiff is not disabled under the ADA rests on the fact that the record is replete with instances of Plaintiff's statements that he can perform all necessary functions of his job. *See, e.g.,* Doc. 31-1 at 4 (In Plaintiff's November 21, 2018 affidavit in support of his EEOC charge, Plaintiff stated, "I didn't ask for any special consideration because I could perform all the necessary duties and functions of my job."); Doc. 1 at 3 (In Plaintiff's Complaint, he indicates he "never requested an accommodation because he could perform, and did perform, all the necessary duties and functions of his job."). Therefore, the Court finds it is undisputed Plaintiff is a "qualified individual" under 42 U.S.C.A. § 12111(8) and Plaintiff meets the second prong of his *prima facie* case.

### 3. Subjected to Unlawful Discrimination Because of his Disability

"To establish the third element [of Plaintiff's *prima facie* case], he must show that he has suffered an adverse employment action because of his disability." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998)).

### a. Adverse Employment Action

Defendant argues placing Plaintiff on paid administrative leave from October 30, 2018, through March 4, 2019, "cannot be considered an adverse employment action." Doc. 27 at 24 (citing *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (holding adverse employment actions "affect continued employment or pay" such as "suspensions without pay[] and pay raises or cuts.")). Specifically, Defendant asserts Plaintiff received his full pay and benefits for the duration of his paid administrative leave, and upon his return to work on March 4,

2019, he "returned to the same position performing the same job functions on the same shift, and received the same pay as he had prior to the leave." *Id.*

"Not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). In defining an adverse employment action, the Eleventh Circuit held:

> The ADA prohibits a wide variety of adverse employment actions when the employer takes those actions for a prohibited reason. *Dekalb*, 145 F.3d at 1447. "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998); *see also Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (explaining that the various terms courts have used to describe the "threshold level of substantiality," such as "significant," "materially adverse," and "serious and tangible," are "essentially interchangeable" and all require that the employer's action impacts the "'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way"). We apply an objective test and require a plaintiff to demonstrate that a reasonable person in her position would view the employment action in question as adverse. *Dekalb*, 145 F.3d at 1448–49.

*Martin v. Eli Lilly & Co.*, 702 F. App'x 952, 956 (11th Cir. 2017); *see also Dekalb*, 145 F.3d at 1447–49.

Here, Plaintiff alleges he was placed on paid administrative leave for about four months and, upon his return to work, his working conditions became so intolerable he has been on a voluntary leave of absence since June 30, 2019, constituting a constructive discharge. Doc. 31 at 18–21. Defendant correctly argues that paid administrative leave is generally not considered an adverse employment action. However, in *Diaz v. Miami Dade County*, the court noted that the Eleventh Circuit has not provided definitive guidance on paid administrative leave in the adverse employment action context and stated further that "in many of the cases where the courts have held that paid leave was not an adverse employment action, the length of leave involved was

shorter than the three months [the plaintiff] received here."  Civ. Act. No. 09-cv-21856, 2010 U.S. Dist. LEXIS 110050, at *23 n.8, 2010 WL 3927751, at *7 n.8 (S.D. Fla. Aug. 17, 2010) (finding a genuine issue of material fact regarding whether his loss of access to overtime while on three-month paid administrative leave constituted an adverse employment action) (citing *Drago v. Jenne*, 453 F.3d 1301 (11th Cir. 2006) (affirming summary judgment in favor of defendant where FMLA plaintiff was required to take only two additional days of paid leave); *Moore v. Miami-Dade Cty.*, Civ. Act. No. 03-22421-CIVGOLD, 2005 U.S. Dist. LEXIS 27245, at *31, 2005 WL 3273722, at *11 (S.D. Fla. Sept. 30, 2005) (stating that "[t]he courts have specifically held that a suspension with pay *for a short period of time* is not an adverse employment action," and concluding that paid administrative leave for little over one month during the pendency of internal investigation was not an adverse employment action) (emphasis added)).

Indeed, several courts have noted the short duration of a paid administrative leave is a significant factor in their decision to decide that it does not constitute an adverse employment action.  *See Hodges v. Vectrus Sys. Corp.*, Civ. Act. No. 2:19-CV-00329-RAH, 2020 U.S. Dist. LEXIS 80166, at *8, 2020 WL 2245123, at *3 (M.D. Ala. May 7, 2020) (holding that the "crucial facts" are that the plaintiffs' suspensions lasted only three days, with no loss in pay, and "after which they returned to their pre-suspension positions."); *Brown v. Bd. of Regents of the Univ. Sys. of Ga.*, Civ. Act. No. 1:14-CV-0365-LMM-LTW, 2016 U.S. Dist. LEXIS 183830, at *27-30, 2016 WL 4925792, at *9 (N.D. Ga. Feb. 12, 2016), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 183838, 2016 WL 5419787 (N.D. Ga. Mar. 1, 2016) (finding that a paid administrative leave of three weeks "was only for a short period of time for the purpose of allowing [defendant] to conduct its investigation of Plaintiff's arrest and there is no indication here that Plaintiff's placement on leave caused him to lose job benefits or otherwise materially affected his

employment."); *Carrio v. The Apollo Grp.*, Civ. Act. No. 1:07-CV-1814-BBM, 2009 U.S. Dist. LEXIS, at *8-9, 2009 WL 2460983, at *3 (N.D. Ga. Aug. 7, 2009) (holding that placement on paid administrative leave pending investigation was not adverse employment action under *Burlington Northern* standard); *Fitzhugh v. Topetzes*, Civ. Act. No. 1:04-CV-325 8-RWS, 2006 U.S. Dist. LEXIS 62630, at *17-18, 2006 WL 2557921, at *5 (N.D. Ga. Sept. 1, 2006) (explaining that placement on paid administrative leave for short period was not adverse employment action)). Thus, Plaintiff's approximately four-month paid administrative leave extended for a longer period than those traditionally discussed within this circuit.

To complicate matters, in *Hairston v. Gainesville Sun Publishing Co.*, the Eleventh Circuit stated, without analysis, a plaintiff asserting a retaliation claim was "the subject of an adverse employment action" when he "was suspended with pay for thirty days." 9 F.3d 913, 920 (11th Cir. 1993). However, Defendant cites to the Eleventh Circuit's more recent holding in *Monaghan v. Worldpay US, Inc.*, that states "[t]angible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, ***suspensions without pay***, and pay raises or cuts—as well as other things that are similarly significant standing alone." 955 F.3d 855, 860 (11th Cir. 2020) (emphasis added). While Plaintiff's paid administrative leave extending slightly over four months is longer than those previously discussed in this circuit considering the additional factors discussed in these cases weighs against a finding that Plaintiff's paid administrative leave qualifies as an adverse employment action. Here, Plaintiff received his full pay and benefits during his four months on administrative leave; he does not allege any lost opportunities such as overtime pay, promotions, raises, or other benefits; and he was returned to his same position at the same pay rate he held prior to his administrative leave. Thus, Plaintiff has not created a genuine issue of material fact that he has suffered an adverse employment action as

a result of his paid administrative leave.

Plaintiff also contends, after he returned to work in March 2019 and in retaliation for his complaints, the Woodyard Superintendent instructed employees in the Woodyard to report on Plaintiff's actions that led to him being counseled and disciplined for actions for which other employees did not receive reprimands.  Doc. 1 at 9–10; Doc. 31 at 13.  "'Negative performance evaluations, standing alone, do not constitute adverse employment action' and 'courts are wisely reluctant to treat job performance memoranda as actionable . . . where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline.'"  *Martin*, 702 F. App'x at 956 (quoting *Lucas*, 257 F.3d at 1261; and *Davis*, 245 F.3d at 1241).  Plaintiff does not provide any evidence that the counseling and discipline he received has triggered any loss in benefits, ineligibility for a promotion, or any other tangible form of adverse action.  Therefore, Plaintiff's allegations that are related to being counseled and disciplined do not rise to the level of an adverse employment action.

### b.    Causation

Even if a trier of fact could consider the four-month length of the paid administrative leave was an exceedingly long duration and/or the disciplinary actions that were taken had a "tangible, negative effect on [Plaintiff's] employment," his claim still fails under the causation analysis.  *Lucas*, 257 F.3d at 1261.  Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C.A. § 12112(a).  "[T]he term 'discriminate against a qualified individual on the basis of disability" includes, in relevant part, "limiting, segregating, or classifying [an] . . . employee in a way that adversely affects the opportunities or

status of such . . . employee because of the disability of such . . . employee." 42 U.S.C.A. § 12112(b)(1). The term "discrimination" further includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C.A. § 12112(b)(5)(A).

As previously set forth, Plaintiff alleges he returned from military service on September 1, 2010, and immediately returned to his position with International Paper. Doc. 31 at 2. Upon his return, Plaintiff was placed in the position that he was in at the time of his deployment; however, subsequently, Plaintiff negotiated his rights under USERRA to be placed in a position in the Woodyard because he would have applied for the 2006 vacancy had he not been on military leave and received the position due to his seniority. Doc. 27 at 7; Doc. 32 at 2. Plaintiff was placed in Hagemann's position who had filled the 2006 vacancy in the Woodyard. Doc. 27 at 7; Doc. 31 at 3. Plaintiff alleges this set off a series of intimidation, discrimination, and harassment because of his military background and because he replaced Hagemann in the Woodyard when he returned from military service. Doc. 31 at 4.

Plaintiff's primary allegations involve Hagemann and Weaver, who work the shift prior to Plaintiff's shift, attempting to sabotage Plaintiff by not doing their work and passing it onto Plaintiff's shift, intentionally creating more work for Plaintiff's shift, making work more difficult for Plaintiff's shift, attempting to turn co-workers against Plaintiff, and filing a baseless grievance against Plaintiff. Doc. 1 at 4–7; Doc. 31 at 3–4 (citing Doc. 31-1 at ¶ 8). Further, Plaintiff alleges, despite reporting the sabotage, intimidation, discrimination, and harassment, Defendant failed to take any action to remedy the hostile work environment. Doc. 1 at 4. Finally, Plaintiff alleges

"after [Defendant] learned that Mr. Alsbrook suffered from PTSD, it almost immediately considered him unfit for work and placed him on administrative leave because of statements he made during meetings regarding his complaints of his work environment.  Actions taken by [Defendant] during Mr. Alsbrook's leave further illustrate [Defendant]'s belief that his PTSD made him unstable."  Doc. 31 at 18.

However, Plaintiff's *prima facie* case falls short because he cannot show he was subjected to unlawful discrimination ***because of*** his disability.  *See Dulaney,* 481 F. App'x at 489 (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007)).  First, by his own admission, Plaintiff "never requested an accommodation because he could, and did perform, all the necessary duties and functions of his job."  Doc. 1 at ¶ 10.  However, Plaintiff did testify he asked for an accommodation that was related to a safety concern when clearing a "choke" in the slasher deck that Hagemann and Weaver "were bad about" causing.  Doc. 27-1 at 249:19–251:19.  Plaintiff proposed purchasing a grapple similar to one at the Prattville mill that was essentially a device controlled by a crane that would be able to resolve the choke without having to lower an employee in there in a basket to cut it manually with a chainsaw.  *Id.* at 251:2–15.  Plaintiff admitted Defendant accommodated that request and purchased the grapple to resolve a safety issue unrelated to his disability.  *Id.* at 251:16–19.

Next, Plaintiff maintained throughout the course of this case the motivation for Hagemann and Weaver's intimidation, harassment, and discrimination was due to Plaintiff "bumping" Hagemann out of his job when Plaintiff returned from military service.  *See* Doc. 1 at ¶ 13 (Complaint: "Part of Mr. Hagemann's motivation appears to be that Mr. Alsbrook bumped him out of his job, when Alsbrook returned from his deployment in Iraq"); Doc. 31 at 3 (Response Brief: "[A]fter Alsbrook replaced Mr. Hagemann in the Woodyard, Mr. Hagemann began intimidating

and harassing Mr. Alsbrook . . . ."); Doc. 31-1 at 4 (EEOC Charge Affidavit: "From the moment that Mr. Hagemann heard I was coming back to the mill and to the Woodyard Department, he began an intensive campaign to incite my fellow co-workers to not allow me to come to the Woodyard."); Doc. 31-2 (Plaintiff's Summary Judgment Affidavit: He made it very clear to me and everyone that he was unhappy with being bumped by me."); and Doc. 31-3 (Ethics Help Line: "Mr. Alsbrook stated he feels he is being discriminated against by Mr. Hagemann because of his military background.  Mr. Alsbrook stated Mr. Hagemann has been giving him a hard time because the position Mr. Hagemann had was given back to him (Mr. Alsbrook) when he returned from the military.").  Plaintiff further testified he has not heard any discriminatory comments related to his disability from Shelly Hobson, Kathy Turner, Kelley Bert, Joe Weaver, Rodney Duncan, Morgan Wedgeworth, Kevin Bruner, Eddie Hyde, Pam Frasier, Phillip Daniels, Jim Bruce, or Buddy Hageman.  *See* Doc. 27-1 at 192:25–228:14.

Finally, Plaintiff alleges, "upon learning" he suffered from PTSD following the October 30, 2018 meeting, Defendant "immediately" considered him a threat, unfit for work, and unstable, and began treating Plaintiff differently.  *See* Doc. 31 at 18–19.  However, Plaintiff's own testimony rebuts this argument.  Plaintiff testified he was "obligated" to inform the human resources department he suffered from PTSD when he returned from military service in 2010.  Doc. 27-1 at 170:4–13.  Additionally, Plaintiff testified he also had to submit paperwork regarding his PTSD to "health services" and Human Resources Department in 2010, but he could not recall the specific person to whom he provided the paperwork.  *Id.* at 255:11–256:15.  Thus, according to Plaintiff's testimony, Defendant was provided notice of Plaintiff's disability in 2010, well in advance of the October 30, 2018 meeting that led to him being placed on paid administrative leave.

Therefore, Plaintiff has not met the third prong of his *prima facie* case because he has not

shown he was subjected to unlawful discrimination because of his disability.

### 4.      Burden Shifting

Finally, even if Plaintiff established his *prima facie* case, he is not able to show Defendant's proffered legitimate non-discriminatory reasons were pretextual.   The Eleventh Circuit has set forth:

> The successful assertion of a prima facie case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir. 2002) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)).  If this occurs, and a prima facie case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer.

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008).

Defendant alleges, in response to Plaintiff's complaint via the Ethics Hot Line, Turner met with Plaintiff and Union Representative Banks.  Following Plaintiff reiterating the complaints of sabotage, the following conversation took place:

> [Plaintiff]: I cannot work in a hostile environment.  I am sick and tired of all the bullshit.  He is going to push my buttons one day and he will find out how protected he really is.
>
> [Turner]: What do you mean by that?
>
> [Plaintiff]: I am just sick of it.  If they want to see, how far I will take it they will find out.
>
> [Turner]: Buddy, what do you mean by that statement?
>
> [Plaintiff]: Take it however, you want to.
>
> [Turner]: I am taking it as a threat.
>
> [Plaintiff]: Divine intervention has kept him safe for this long.  I am not going to put up with the bullshit one more minute.  Mill management has proven they are not going to do a damn thing about it.  I know what I can sue this company for and what I can sue them for.
>
> [Turner]: Buddy, I am going to ask you again, what do you mean by you are going to take care of it?
>
> [Plaintiff]: I told you to take it however, you want to.  If no one in this company will do anything about it I am going to.

[Banks]: Buddy, you need to calm down.  You cannot mean it as a threat.  Just calm down.  Kathy is trying to help.  You have not ever talked to her.  She is trying to help you.

Doc. 31-3 at 3.  Turner concluded the meeting and stated they will continue to investigate his complaints.  *Id.* at 4.

Plaintiff visited the Human Resources department on October 30, 2018, to inquire about the status of the investigation into his complaints.  Doc. 31 at 6; Doc. 31-3 at 7.  Expressing his anger at the progress, or lack thereof, of the investigation, Plaintiff stated he "would have to deal with it on his own."  Doc. 31-3 at 7.  A meeting was called that afternoon to discuss what Plaintiff meant by "deal with it on his own."  *Id.*  Wedgeworth asked Plaintiff what he meant by his "deal with it on his own" comment and asked if he was referencing his EEO complaint.  *Id.*  Plaintiff responded "[w]hatever it takes, nothing further" and stated he told his supervisor "are you going to put an end to it or am I going to put an end to it."  *Id.*  After much heated debate, Plaintiff further stated "I can either keep putting up with it or I can not put up with it.  I am not putting up with it anymore."  *Id.* at 9.  Wedgeworth again asked what he meant by these comments and Plaintiff responded with "[a]ll of my options are on the table" and they "got all the information you need."  *Id.*  Plaintiff was sent home to cool off and was advised the next day he is to not return to work until Defendant concludes its investigation into his comments that were perceived as a threat against the safety of employees at International Paper.  Doc. 31 at 6.  It was not until the November 6, 2018 conference call with Hobson and Banks Plaintiff clarified his statements were not intended as a violent threat.  Doc. 31-3 at 12.  Plaintiff was on paid administrative leave from October 31, 2018, through March 4, 2019.  Doc. 27 at 15; Doc. 31 at 7.  Plaintiff returned to work from March 4, 2019, through June 30, 2019, at which point he informed Defendant he would be taking an indefinite leave of absence.  Doc. 27 at 15; Doc. 31 at 8.

Additionally, as part of the investigation, Defendant separately interviewed Hagemann, Weaver, Dunkin, Daniels, and Hasberry. Doc. 31-3 at 4–6. Hageman stated he is actually the one being harassed by Plaintiff and Plaintiff assumes every mistake or issue is done on purpose. Doc. 27-3 at 8. Hagemann further stated Plaintiff has "had it out" for him for years due to issues that arose when they were members in a hunting club together. *Id.*

Weaver's comments echoed Hagemann's in that he felt they were being harassed by Plaintiff due to personal issues between Plaintiff and Hagemann that were related to their membership in a hunting club and they are blamed for everything that goes wrong on Plaintiff's shift. *Id.* at 9.

Daniels indicated he has witnessed Plaintiff and Hagemann mutually make inappropriate harassing comments in the workplace, but he has never witnessed any sabotage. *Id.* Daniels noted he has seen used knives placed near new knives, but has never witnessed anyone intentionally placing them there. *Id.* Daniels further stated there are "normal operating problems within the department" but they are "small stuff" to him, but Plaintiff complains to him every day about the previous shift leaving messes or not cleaning up and demanding they be written up. *Id.* Daniels stated he has never witnessed Plaintiff being bullied or intimated, rather Plaintiff is the bully and intimidator in the Woodyard. *Id.* Daniels further stated the work environment can be hostile "at times," but "if [Plaintiff] is happy we are all happy." *Id.* at 9–10.

Hasberry stated he has never witnessed any harassment, verbal or physical harassing actions, retaliation, sabotage, bullying, intimidation, or discrimination directed at Plaintiff. Doc. 27-3 at 10. However, Hasberry stated Weaver, Hagemann, and Plaintiff all discriminate or harass each other mutually. *Id.* Hasberry stated he does not feel there is a hostile work environment. *Id.*

The Court finds Defendant's actions were taken for a legitimate, non-discriminatory

reason, and Plaintiff has presented no evidence that Defendant's articulated reason is pretext for discrimination. The record does not indicate anyone associated with Defendant has ever discriminated against Plaintiff because of his disability. Indeed, as previously discussed, Plaintiff testified no one at International Paper has made any reference to his disability. Plaintiff has not shown Defendant's given reason for placing him on paid administrative leave was pretext for discrimination on the basis of his disability. Accordingly, Defendant's motion for summary judgment as to Plaintiff's ADA discrimination claim (Count One) is granted.

### C.    Count 2 – ADA Retaliation

In Count 2 of Plaintiff's Complaint, he brings a retaliation claim pursuant to the ADA against Defendant. Doc. 1 at ¶¶ 38–40. Plaintiff claims he raised multiple complaints that he was "being harassed and intimidated and that he suffers from PTSD," and Defendant retaliated against him by placing him on paid administrative leave and counseled and disciplined him for actions for which other employees were not disciplined. Doc. 1 at ¶¶ 30–31; Doc. 31 at 13, 23–26.

Defendant argues Plaintiff's retaliation claim pursuant to the ADA fails because he never alleged he was being harassed, discriminated against or treated differently ***because of*** his disability, he cannot show that his paid administrative leave is an adverse employment action, or show there is a casual link between his complaints and the alleged adverse employment actions. Doc. 27 at 37–38. Defendant further asserts, even if Plaintiff were able to establish a *prima facie* case for retaliation, his claim still fails because Defendant "had a legitimate, non-retaliatory reason for all of its actions, including placing Plaintiff on administrative leave with full pay and benefits," and he cannot establish the proffered reasons are pretext. *Id.*

"The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016)

(citing 42 U.S.C. § 12203(a)); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (citation omitted) ("The first part of the anti-retaliation provision is known as the 'opposition clause' and the second part as the 'participation clause.'").  ADA retaliation claims are analyzed under the same framework that is employed for retaliation claims that arise under Title VII.  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075–77 (11th Cir. 1996)); *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014).  "To prevail on [Plaintiff's] ADA retaliation claim, [he] must show that (1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two."  *Frazier-White*, 818 F.3d at 1258 (citing *Lucas*, 257 F.3d at 1260).

> Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation.  *See Goldsmith* [*v. City of Atmore*], 996 F.2d [1155,] 1163 [(11th Cir. 1993)].  The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation.  *Cf. Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996).

*Stewart*, 117 F.3d at 1287.

Plaintiff is unable to prove the second element of his *prima facie case* because the Court determined he did not suffer an adverse employment.  Plaintiff is also unable to prove the first and third elements of his *prima facie* case: he engaged in a statutorily protected expression and there was a causal link between his statutorily protected expression and his alleged adverse employment action.

"[T]o satisfy the first element of the *prima facie* case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (citations omitted).  Plaintiff asserts

he repeatedly reported complaints of the unlawful practice of discrimination, including informal reports to his superiors, a complaint through the Ethics Help Line, and he also filed two EEOC charges. Defendant argues Plaintiff "never alleged he was being harassed, discriminated against or treated differently *because of* any alleged disability," only he was being "sabotaged" and, thus, cannot establish he engaged in protected activity. Doc. 27 at 36. However, in Plaintiff's first EEOC charge, he explicitly set forth allegations related to being discriminated against based on his disability, among others. *See* Doc. 31-1 at 3–9.

Defendant does not argue filing an EEOC charge is not a statutorily protected activity, but argues Plaintiff has not provided evidence that Brown, who allegedly subjected Plaintiff to the retaliatory discipline upon returning to work, was aware of the EEOC charges. Plaintiff asserts through his attorney, Defendant was mailed a letter with the EEOC charge attached on November 21, 2018, and an additional letter was sent to Defendant on December 10, 2018, to address an issue related to a paycheck and included reference to the EEOC charge. Doc. 31-4 at 1–2. The Court notes neither letter was sent to Brown, and Plaintiff does not argue Brown gave any indication that he was aware of the EEOC charges. *Collins v. Bd. of Trs. of Univ. of Ala.*, 211 F. App'x 848, 850 (11th Cir. 2006) (finding no reversible error where plaintiff failed to present evidence that the supervisor responsible for plaintiff's increased workload was aware of his protected activity before increasing the workload). While filing an EEOC charge is certainly a protected activity, Plaintiff has failed to present evidence that Brown was aware of the EEOC charges prior to taking disciplinary action. Thus, Plaintiff has failed to show the disciplinary actions taken after he returned to work March 4, 2019, were in retaliation for a protected activity.

Additionally, when Plaintiff issued a complaint through the Ethics Hot Line, he stated he felt like he was being discriminated against based upon his military background. Doc. 27-3 at 6.

However, as Defendant asserts, Plaintiff's retaliation claim is brought under the ADA and he did not allege any discrimination based upon his disability, only his military status. *Birdyshaw v. Dillard's Inc.*, 308 F. App'x 431, 436–37 (11th Cir. 2009) (holding a Title VII plaintiff "was not opposing any employment practice made unlawful under Title VII because she referred only to age, which is not a protected ground under the statute").[3]

As to the third element of the *prima facie* case, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798–99 (11th Cir. 2000)). "To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.'" *Brungart*, 231 F.3d at 799 (internal quotation marks and citations omitted). However, mere temporal proximity without more, must be "very close" and a three-to-four-month disparity between the statutorily protected expression and the adverse employment action is not enough. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (per curiam) (citations omitted). Based on the facts presented, it does not appear Plaintiff made out his *prima facie* case.

First, regarding his paid administrative leave, Plaintiff did not file his EEOC charges until November 21, 2018, and May 28, 2019, dates that were both after Plaintiff was placed on paid administrative leave. Thus, Defendant could not have been aware of the protected conduct prior

---

[3] However, even if the Court were to find Plaintiff had "a good faith, objectively reasonable belief that his activity is protected by the statute" when he made his complaint via the Ethics Help Line or his alleged informal verbal complaints to his supervisors, Plaintiff is still unable to show the Defendant's proffered legitimate, non-discriminatory reason was pretextual. *Standard*, 161 F.3d at 1328.

to placing Plaintiff on paid administrative leave. *See Singleton v. Pub. Health Tr. of Miami-Dade Cty.*, 725 F. App'x 736, 738 (11th Cir. 2018) (citation omitted) ("We have held that, where a decision-maker becomes aware of protected conduct, a close temporal proximity between the decision-maker's acquisition of that knowledge and an adverse employment action will generally be enough to create a factual issue on the causation element."). However, Plaintiff lodged his complaint via the Ethics Help Line in September 2018. Plaintiff was not placed on paid administrative leave until October 30, 2018. The parties do not provide the exact date, so making all inferences in a light most favorable to the Plaintiff, the Court will assume the date on which Plaintiff was placed on paid administrative leave was closer to a one-month gap rather than a two-month gap. The Eleventh Circuit has held a one-month interval between the protected activity and the adverse employment action may be sufficient to show causation and satisfy a plaintiff's burden. *See Castillo v. Roche Labs. Inc.*, 467 F. App'x 859, 862 (11th Cir. 2012); *Stone v. Geico Gen. Ins. Co.*, 279 F. App'x 821, 824 (11th Cir. 2008) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). The Court finds a reasonable jury could find a "close temporal proximity between the statutorily protected activity and the adverse employment action" exists in this case.[4] *Thomas*, 506 F.3d at 1364.

However, assuming Plaintiff made out his *prima facie* case for retaliation in regard to his paid administrative leave and disciplinary actions taken against him, Defendant argues such actions were made for legitimate non-discriminatory reasons. As discussed, during a meeting between Plaintiff, Turner, and Banks, Plaintiff made certain comments that were perceived as physically threatening. A second meeting was held the same afternoon to determine what Plaintiff

---

[4] With regard to Plaintiff's allegation that after he returned to work he was disciplined in retaliation for filing his EEOC charges, the Court already found Plaintiff has failed to present evidence that the decisionmaker was aware of the EEOC charges prior to initiating the disciplinary actions.

meant by his comments. Given multiple chances to clarify Plaintiff's statements, he simply responded to each request in a vague manner that was further perceived as threatening in nature. As a result, Plaintiff was sent home for the day to cool down, and the next day. he was informed he was being placed on paid administrative leave pending an investigation into his comments. Plaintiff was on paid administrative leave from October 30, 2018, through March 4, 2019. Plaintiff alleges he had never received counseling or disciplinary actions until he returned, at which time Brown counseled and disciplined him for actions Defendant had not previously enforced. On June 30, 2019, Plaintiff informed Defendant he would not be returning to work and Defendant placed him on a voluntary leave of absence.

Defendant argues despite Plaintiff's alleged claims of discrimination, the reasons for his paid administrative leave were reasonable and the events that led to his leave were prompted by the perceived threats Plaintiff made toward Hagemann and Weaver. Defendant provided Plaintiff multiple opportunities to clarify his statements, and rather than clarify his statements, he doubled down and made additional statements that could reasonably be construed as threatening in nature. It was not until a telephone conference on November 6, 2018, when Plaintiff was willing to claim he did not mean his comments as threats of physical violence, but meant the threat to mean he would seek legal counsel.

Based on the timeline of events, the Court finds Plaintiff does not rebut the legitimate non-discriminatory reasons put forth by Defendant. The mere fact that Plaintiff may have raised the specter of discrimination or workplace hostility does not mean an employer cannot discipline an employee when subsequent issues arise.

As to Plaintiff's paid administrative leave, he argues, on November 6, 2018, he clarified his comments were not meant as threats of physical violence, yet Defendant kept him on paid

administrative leave until March 4, 2019, pending the investigation into his comments.  Doc. 31 at 24–25.  Further, Plaintiff states, on February 20, 2019, Defendant sent an e-mail to multiple employees and placed a sign near the clock-in area indicating Plaintiff "should not be allowed back on mill premises until further notice."  *Id.* at 25–26.  The role of the Court "is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments."  *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000).  Plaintiff cannot merely "recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer;" Plaintiff "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

The Court will not second-guess Defendant's decision to conduct an extended investigation, and Plaintiff has not carried his burden to rebut Defendant's reasons and show they were pretextual.  Accordingly, Plaintiff has failed to present evidence from which a reasonable jury could find any causal connection between his Ethics Help Line complaint, or his EEOC charges, and his paid administrative leave in 2018 or the counseling and disciplinary actions he received in 2019.  Consequently, the motion for summary judgment as to Plaintiff's ADA retaliation claims (Count Two) is granted.

## D.    Count Five – Hostile Work Environment Under the ADA

In Count Five of Plaintiff's Complaint, he brings a hostile-work-environment claim pursuant to the ADA.  Doc. 1 at ¶¶ 48–49.  Plaintiff claims he was subjected to a cold and hostile working environment because of his complaints of discrimination and Defendant knew of the hostile work environment.  *Id.*

Defendant argues Plaintiff's hostile-work-environment should be dismissed because he

cannot show "any treatment, including any action taken by his coworker Hagemann, or his paid administrative leave for deliberately threatening violence, was based on Plaintiff's alleged disability [. . .] ." Doc. 27 at 38–39.  Defendant further argues Plaintiff cannot establish his treatment was objectively so severe or pervasive to affect a term or condition of his employment, but simply alleges typical workplace concerns that coworkers "disrupted Plaintiff's work processes by: (1) putting old knives in a pile of new knives; (2) failing to clear the 'choke' on the wood chipper machinery; (3) failing to replace the bad saws; (4) slowing down the process lines; and (5) failing to take corrective measures for the proper functioning of the wood yard." *Id.* at 40–41.

"While the [Eleventh Circuit] has not yet addressed the issue, several other circuits have concluded that the ADA provides a cognizable claim for a disability-based hostile work environment." *Cooper v. CLP Corp.*, 679 F. App'x 851, 853 n.2 (11th Cir. 2017) (per curiam) (citations omitted).  The Supreme Court has found cognizable a claim for hostile work environment under Title VII when it construed language from Title VII that is found in the ADA, which language states discrimination is prohibited in the "terms, conditions, and privileges of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing 42 U.S.C. § 2000e-2(a)(1)); *Cooper*, 679 F. App'x at 852 (citing *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 and 42 U.S.C. § 12112(a)).  Therefore, the Court will use the analysis for a hostile-work-environment claim under Title VII for Plaintiff's hostile-work-environment claim under the ADA.

"To prove a hostile work environment claim, an employee must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018) (citing

*Harris*, 510 U.S. at 21, 114 S. Ct. at 370).

> To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile. *Mendoza v. Boden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). In other words, the employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21, 114 S. Ct. 367. Then she also must satisfy the objective component by showing that her work environment was one "that a reasonable person would find hostile or abusive." *Id. . . .*

> Turning to the objective inquiry, we consider four factors when evaluating whether harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct reasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant* [ ], 575 F.3d [at] 1297 [ ]. We must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

*Smelter*, 904 F.3d at 1285.

Plaintiff alleges he faced intimidation and harassment by Hagemann "on multiple occasions: March 19, 2018; March 20, 2018; March 21, 2018; July 2, 2018; July 30, 2018; August 8, 2018, and September 2, 2018," and when he complained about these issues, he was placed on paid administrative leave. Doc. 31 at 27–28. Plaintiff further alleges, when he returned to work in March 2019, his work environment did not improve because Brown ordered other Woodyard employees to monitor and report Plaintiff's daily actions. *Id.* at 28. Consequently, Plaintiff alleges the hostile work environment caused him to take a voluntary leave of absence. Plaintiff notes, during Defendant's investigation, other employees confirmed Plaintiff suffered harassment. *Id.*

The Court found Plaintiff failed to show any targeted harassment or disciplinary actions were taken ***because of*** his disability. The Court also found Plaintiff did not suffer an adverse employment action when he was placed on paid administrative leave or when he was disciplined, he did not establish a claim for retaliation, and as discussed below, he was not constructively

discharged.  The Court further found the interviews conducted over the course of Defendant's investigation revealed there was mutual harassment between Plaintiff, Hagemann, and Weaver. While the Court credits Plaintiff's subjective opinion that personal grudges between himself and a co-worker made the working condition more stressful, nothing in the evidentiary materials indicates the alleged harassment was so pervasive as to alter the conditions of Plaintiff's employment and create an abusive work environment.  *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233 (11th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998)) ("While the conduct Plaintiff allegedly experienced may be inappropriate in a working environment and may have been unjustified," discrimination laws do not operate as a "'general civility code' that ensure a workplace free of stress or criticism, justified or not.").

Accordingly, the Court finds Plaintiff has not carried his burden to show his workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. Defendant's motion for summary judgment as to Plaintiff's retaliatory-hostile-work-environment claim (Count Five) is granted.

## E.    Constructive Discharge

Finally, Defendant argues, to the extent Plaintiff is attempting to assert an ADA claim that is based on a constructive discharge, he failed to exhaust his administrative remedies, his voluntary leave constituted a new act, and he has not resigned and is still a current employee. Doc. 27 at 18–20; Doc. 32 at 5–8.  Specifically, Defendant asserts "[t]here is no mention of any constructive discharge or any specifics that could be reasonably construed as a constructive discharge claim" in either EEOC charge. Doc. 27 at 18–20.  Additionally, Defendant states that Plaintiff's alleged

constructive discharge occurred seven months following his first EEOC charge, and one month following his supplemental EEOC charge and, thus, constitutes a new act that could not have been alleged in his EEOC charges. *Id.* at 20. Finally, Defendant contends, on June 30, 2019, Plaintiff took a voluntary leave of absence, he has not resigned, he is still a current employee, and he may return to his position when he concludes his voluntary leave of absence. Doc. 32 at 5–8.

### a.     Exhaustion of Administrative Remedies

Exhaustion of administrative remedies is a prerequisite for filing federal claims under the ADA. *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled in part by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003); *Babicz v. Sch. Bd. of Broward Cty.*, 135 F.3d 1420, 1442 (11th Cir. 1998). "In order to litigate a claim for discrimination under Title VII, the ADA, or the ADEA a plaintiff must first exhaust his administrative remedies, beginning with the filing of a charge of discrimination with the EEOC." *Rizo v. Ala. Dep't of Hum. Res.*, 228 F. App'x 832, 835 (11th Cir. 2007). "[J]udicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint," but "allegations of new acts of discrimination are inappropriate." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004); *see Anderson v. Embarq/Sprint*, 379 F. App'x 924, 926 (11th Cir. 2010) (plaintiff complaining only of race discrimination, age discrimination, disability discrimination, and retaliation failed to exhaust failure-to-promote claim). Further, the Eleventh Circuit held:

> In light of the purpose of the EEOC exhaustion requirement, we have held that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander* [ ], 207 F.3d [at] 1332 [ ] (internal quotation and citation omitted); *Sanchez,* 431 F.2d at 466 (noting that the allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to the allegations contained in the charge). Courts are nonetheless "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Sanchez,* 431 F.2d at 460–61. As such, this Court has noted that "'the scope of an EEOC complaint should not be strictly interpreted'" *Id.* at 465 (citation omitted).

*Id.* at 1280.

Thus, the proper inquiry is whether the facts supporting Plaintiff's constructive-discharge claim are "like or related to, or grew out of, the allegations contained in [his] EEOC charge." *Id.* As Plaintiff points out, in his November 21, 2018, EEOC charge, he stated "my supervisors and managers at International Paper Company do not care about my depression disability, and instead, have caused a cold and hostile working environment, ***hoping to get me to resign***." Doc. 31-1 at ¶ 6 (emphasis added). Further, Plaintiff stated "***[i]n an effort to make the environment so hostile that I would want to quit***, International Paper Company has allowed and encouraged a fellow co-worker, Edward (Buddy) Hagemann, to harass, attempt to intimidate, and create what has become an extremely hostile work environment for me to work in." *Id.* at ¶ 8 (emphasis added). Although Plaintiff did not include a count in the Complaint for constructive discharge or specifically reference it in his EEOC charges, he does reference to it being the basis of an adverse employment action throughout both. The Court finds Plaintiff plead facts specific enough related to Defendant's attempt to force a constructive discharge that it is "like or related to, or grew out of, the allegations contained in [his] EEOC charge" and was within the scope of the EEOC investigation, even if he did not use the specific terminology. *Gregory*, 355 F.3d at 1280.

### b.    Allegations of New Acts

Next, Defendant argues "Plaintiff's leave of absence began over seven months after Plaintiff filed his EEOC charge and more than a month following his submission of the Supplemental Affidavit" and, thus, he could not have alleged these claims in his EEOC charge because they are "allegations of new acts." Doc. 27 at 20. Defendant further asserts the "allegations in Plaintiff's Complaint that his leave should be considered a constructive discharge in no way 'amplify, clarify, or more clearly focus' any of the factual allegations Plaintiff included

in his EEOC Charge.  *Id.* (quoting *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 587–88 (11th Cir. 2007)).  The Court disagrees.  In his EEOC charge, Plaintiff asserted continuing discrimination in the form of making his work environment so hostile and intolerable they were attempting to force him to resign.  One month after Plaintiff filed his supplemental EEOC charge, Plaintiff ultimately informed Defendant he would be taking a voluntary leave of absence due to the working environment that he had been subjected to and complained about, yet the issues were never resolved by Defendant.  The Court finds, under the particular set of facts presented, Plaintiff's constructive-discharge claim is not an allegation of a new act.

### c.    Constructive Discharge

Finally, although not explicitly pled in his Complaint, Plaintiff alleges, due to the hostile working environment that was allowed and encouraged by Defendant, he was required to take a voluntary leave of absence on June 30, 2019, a status in which he remains.  Doc. 31 at 9–15.  Plaintiff asserts this voluntary leave of absence is tantamount to a constructive discharge.  *Id.*  Defendant argues Plaintiff was not constructively discharged because he did not resign, but is a current employee on a voluntary leave of absence.  Doc. 32 at 5.

The Supreme Court of the United States held:

> The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).  When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. *Id.,* at 142–143, 124 S. Ct. 2342.

*Green v. Brennan*, -- U.S. --, 136 S. Ct. 1769, 1776–77, 195 L. Ed. 2d 44 (2016).  A constructive discharge claim "is no different from a claim that an employer actually discharged an employee," thus, it has "two basic elements: discrimination and discharge."  *Id.* at 1777.  Therefore, a plaintiff

must prove "that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and "he must also show that he actually resigned." *Id.* (citing *Pa. State Police*, 542 U.S. at 141, 124 S. Ct. 2342).

First, as this Court has decided, Plaintiff is unable to show that he faced discrimination because of his disability, thus, he has also failed to meet the first element of a constructive discharge claim as a result. Next, assuming *arguendo* that Plaintiff were able to meet the first element of a constructive discharge claim, he cannot meet the second element either because he has not "actually resigned." *Green*, 578 U.S. 1084, 136 S. Ct. at 1777. It is undisputed that Plaintiff is still a current employee of International Paper and that on June 30, 2019, Plaintiff notified Defendant that would be taking a voluntary leave of absence. Plaintiff does not cite to any case law, nor does the Court find any, in which any court within the Eleventh Circuit has held that a plaintiff who is on a voluntary leave of absence while currently employed by the defendant constitutes a constructive discharge. In fact, in the only case Plaintiff cites, the Eleventh Circuit clearly indicated that the plaintiff had voluntarily resigned from her position, therefore, the cases are factually inapposite. *See Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 552 (11th Cir. 1997). Accordingly, Defendant's motion for summary judgment as to Plaintiff's constructive discharge claim is granted.

## V.   CONCLUSION

Based on the foregoing discussion and analysis, it is hereby **ORDERED** that *Plaintiff's Motion to Dismiss Counts Three, Four, Six, and Seven of his Complaint* (Doc. 29) and *Defendant's Motion for Summary Judgment* (Doc. 26) are both **GRANTED** which results in all claims being

**DISMISSED with prejudice**.[5]

A separate judgment that is consistent with this memorandum opinion and order will be

entered pursuant to Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the 29th day of September 2021.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE

---

[5] In its response to *Plaintiff's Motion to Dismiss Counts Three, Four, Six, and Seven of his Complaint* (Doc. 29), Defendant states it still believes it is entitled to recover costs.  To the extent Defendant still makes that assertion, Defendant is **ORDERED** to file by **October 14, 2021,** a motion for its costs that are associated with litigating the four Counts that have been voluntarily dismissed.  As part of that motion and brief, Defendant must support its position that it is entitled to costs associated with the voluntarily dismissed claims.  Further, Defendant must specifically address the presumption that Plaintiff's counsel complied with the Fed. R. Civ. P. 11(b) obligations and did not unreasonably pursue the claims that were ultimately voluntarily dismissed.